### Bridges & Early v. Lud Williams, Administrator.

Decided January 15, 1902; February 12, 1902.

**1.—Surprise—Continuance—New Trial.**

A party who goes to trial upon a well grounded belief that certain material evidence (account books) can be had when needed, should move for a continuance on discovering that he was mistaken in such belief; if he proceeds, taking his chances of a verdict, the surprise will not be ground for a new trial.

**2.—Possession—Trespass.**

The administrator of a decedent can recover, by virtue of the latter's lawful possession, for the conversion of property wrongfully taken from the latter by trespassers.

**3.—New Trial—Newly Discovered Cumulative Evidence.**

A new trial will not be granted on account of the discovery of new evidence which is merely cumulative,—testimony of the same kind and to the same point as that introduced on the trial.

Appeal from the County Court of McLennan. Tried below before Hon. G. B. Gerald.

*John G. Winter,* for appellants.

*J. E. Yantis* and *L. Williams,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—Suit by Lud Williams, administrator of the estate of A. B. Thomas, deceased, against Bridges & Early, to recover for certain goods, or their value, alleged to have been wrongfully taken from Thomas while yet living, though unconscious,—the goods alleged to be worth $327.30.

Defendants set up that the Lewis Grocery Company was the owner of the merchandise, which owed them $240.96, and that the goods taken by them from the company was in payment of that debt, and were substantially the same goods sold by them to the company, the value of which was not more than sufficient to pay said debt.

The goods were not found and plaintiff had judgment for $291.30, from which this appeal is prosecuted by defendants.

The principal facts are clearly stated in the testimony of John Vivrett, as follows: "I knew A. B. Thomas in his lifetime. He died the 4th day of December, 1899. At the time of his death he was engaged in a grocery store on South Third street, in Waco. I do not know who owned the business. It was known as the Lewis Grocery Company, a retail grocery company. Mr. Thomas employed me to work in the store. He gave me directions as to my duty. He managed the business. The stationery, bill heads, etc., bore the name of the Lewis Grocery Company. Mr. Thomas's name did not appear on any of the signs, paper or bill heads. I do not know who composed the Lewis Grocery Company. Never did ask. The business was run under the name of the Lewis Grocery Company for five or six years prior to Mr. Thomas's death, and I never knew of anybody being connected with it.

"On the 4th day of December, 1899, about 6 o'clock in the morning, I found Mr. Thomas in the back end of the store in an unconscious state, and went out and called for help. We sent for Dr. Curtis, who arrived shortly afterwards, when he was taken to his boarding house, about four blocks away. I do not know whether he ever regained consciousness. If he did, I did not know it. He died that night about 11 or 12 o'clock. I was with him when he died. The Lewis Grocery Company owed Bridges & Early. During the day before Mr. Thomas died, Mr. Bridges came to me and asked me to let him have the goods to the amount of their account. I was uncertain what to do, and put him off. We met several times during the day, and finally, about 7 o'clock, we met and I told him that I would go to the store and get the goods. We, Mr. Bridges and Mr. Penry, his attorney and I, went to the store and went in and put up a wagon sheet to keep the curious passers by from gathering about the front. Mr. Bridges knew of Mr. Thomas's illness and his likelihood to die, and that was discussed as one of the reasons he wanted his bill settled.

"Mr. Bridges collected such goods as had been bought from Bridges & Early, with a few exceptions. The prices were agreed on at cost or wholesale price, or perhaps a little more, and measured and counted and weighed, and all laid aside in a pile to themselves. We made no bill at the time. The amount of goods I let Bridges have about paid his debt. We got through about 9 o'clock and next morning came back and I opened the store, and they took the goods out which had been delivered to them the evening before. The goods sold to Bridges, Early & Co. consisted of nearly all the staple goods in the store. The bill amounted to about the sum due Bridges & Early by the Lewis Grocery Company. In discussing about selling them the goods, something was said about an attachment against the stock, and I thought I had better let them have the goods. I never settled any bills before. Mr. Thomas had never told me to do so. I did not keep the books, and did not know the state of the accounts with those from whom he purchased goods. I never sold such a bill before as this one to the defendants, or anyone else. Mr. Thomas never told me to sell at wholesale. I did not sell any other goods during the day that Mr. Thomas was ill. I did not agree to let them have the goods until they threatened to attach the stock, which I was satisfied would be injurious to the business. Mr. Thomas never told me that the business was his, or who the Lewis Grocery Company was. My general duties were to sell goods or take orders, etc., and I bought some goods. I took full control of the business in Mr. Thomas's absence. When Mr. Thomas was in jail on a charge of murder, the plaintiff, Mr. Williams, took charge of the business and put me and a relative of his in charge. I don't know how he got the keys. I did not have any. This was in 1897, about two years before Mr. Thomas's death. The business was then on Eleventh and Webster streets, and after Mr. Thomas got out of jail, he took charge again and later on moved to South Third street. I always carried the keys to the Third street store. The morning I found Mr. Thomas I also found two letters from him on his desk, one addressed to me and one addressed to Mr. W. E. Owens. [The witness was shown two letters addressed as stated, which he identified as the same letters, and said the same were written by A. B. Thomas, being the same letters introduced in evidence by defendants.] In talking about selling them the goods, something was said about running an attachment for the debt, and I thought I had better let them have the goods and settle their bill. I never settled any bills before, unless Mr. Thomas told me to do so. I did not keep the books, and did not therefore know the state of the accounts with persons from whom he purchased goods. I never sold such a bill before to Bridges, Early & Co. or anyone else. Mr. Thomas never told me to sell at wholesale. I did not sell any other goods during the day Mr. Thomas was ill."

Thomas was unconscious from the effects of the poison he had taken—morphine and opium—at the time the goods were set aside for Bridges & Early, and was in that condition until he died. The testimony shows

that he was in possession of the goods and was carrying on the business in the name of the Lewis Grocery Company, and he had been doing business under that name for five or six years prior to his death. He knew nothing about the delivery of the goods taken by Bridges & Early, and was unconscious at the time the goods were taken by them. Bridges & Early carried the goods away and appropriated them.

Thomas was charged with murder in 1897, and he told his counsel that the little store was, all he had in the world, and told the counsel that it belonged to him; this was about one year before he died. At Waco, December 3rd, he wrote Mr. W. E. Owens the following letter:

"W. E. Owens: Dear Bro.—What I am about to do I will not attempt to justify, for to one who has not passed through what I have there could be no clear conception. The inhumanity of some of Waco's people is beyond belief save to those who have borne its burdens. This is the last time I will be able to defend myself, so I wish to reiterate my evidence. I did not seek the difficulty with Penn & Stewart. It was forced on me. They were full of bad whiskey (was there ever any good whiskey) that, coupled with their evil motives, made my appeals to reason unheeded. The fight was pushed on me. It was slay or be slain. I want you to see that I am buried. The business owes me ($50.00) fifty dollars. It is all I have. It will buy a cheap coffin and pay for a coach. This business belongs to Dr. J. L. Goree of Pine Bluff Ark. I have no interest in it. I want John Vivrett to have my personal belongings after I am buried. Forgive, O forgive, your Bro., A. B. Thomas."

Also under date of December 3d, the following letter:

"Dear Old John: I can not leave you without saying goodby and thanking you for your faithfulness and for the tender regard you have always treated me with. Let us hope that there is a world beyond the cedars and the stars, when we may meet again and find that peace so far removed in this. I have directed that you receive all my personal belongings. I would have done more for you, but it is impossible. I have exhausted all my means except fifty dollars in the safe to bury me. John, Please look after the horse until he is disposed of, see that he gets proper attention. He too has been faithful. Again there is the cat. If it is locked up in the store without food or drink for long it too will suffer. If you have a few spare moments, please look after them for old time sake, and when you meet anyone who stood by me in my hour of trouble thank them for me. I cant write them all. Now farewell, and may your future be bright. Give my regards to your wife and boys. Your friend, A. B. Thomas.

"I have some money ($2.50) in an envelope on the desk. It is for the druggist on eighth street,—you knew him—please see that he gets it."

Both letters were read in evidence by defendants.

Lud Williams qualified as administrator of Thomas's estate December 5th, after Thomas died, and called on Bridges & Early for invoice of the

goods taken by them out of the Thomas stock, and they gave it to him, the same invoice upon which this suit is brought. He owed Bridges & Early $240.96, and the value of the goods taken by them was about equal to the debt.

*Opinion*—Defendants moved for a continuance, which was refused, and they went to trial. After trial they asked for a new trial setting up the following as causes:

"1.   That on the morning of said March 25th, and before announcing ready for trial in this cause, one of defendants' attorneys, to wit, the undersigned, John G. Winter, asked of the plaintiff, Lud Williams, Esq., where the books of account of the Lewis Grocery Company were, and Mr. Williams replied that they were at his office, and in response to further inquiry by said Winter, said that said books could be obtained on adjournment of court. That said Winter, relying thereon and knowing that he would not reach the period in the trial of the case until the afternoon when such books would be needed to offer in evidence, the defendants went to trial, expecting and believing that said books could and would be then produced in court; that at the noon recess on said 25th day of March of this court, L. C. Penry, Esq., one of the attorneys for defendants, at the instance of said Winter, went to plaintiff's office for said books, to obtain and use them in evidence for defendants at the afternoon session of court; but said Penry was then informed, as affiant is informed and believes and so avers, by said Lud Williams, plaintiff, that he, plaintiff, was mistaken in thinking that said books were in his office, and that they were locked up in a certain safe, which was held by the Cooper Grocery Company. That thereafter, at the afternoon session of court, said plaintiff and M. A. Cooper, a witness on the trial of said cause, in open court stated that the combination of said safe had been lost or mislaid, and that it was impossible to open said safe until the combination could be obtained from the makers of said safe. That a day or two after said time, when it was definitely found that said safe could not otherwise be opened, defendants procured the said M. A. Cooper to write to the makers of said safe, to wit, the Mosler Safe Company, at Hamilton, Ohio, to send said combination, and this defendant remitted to said company one dollar and fifty cents, the fee charged therefor. That on or about the 6th day of April defendants learned that said Cooper had received said combination and at once applied to said Cooper to open said safe and allow defendants access to said books, but that said Cooper refused to do so, except in the presence of plaintiff. That defendants were unable to secure a meeting with plaintiff at the place where said safe was, to have it opened, until, to wit, the 10th day of April, at which time said safe was opened and said books taken therefrom. That defendants immediately procured said books to be examined by a competent person, to wit, G. H. Bridges; and defendants are informed and believe upon said information and belief aver and show to the court that it appears

from the entries in said books of account that the business of the Lewis Grocery Company belongs to two men, to wit, N. E. Lewis and J. L. Goree, and not to plaintiff's intestate, and defendants hereto attach the affidavit of said Bridges to that purport and make the same a part hereof, and pray that it be so taken and allowed, and defendants show to the court that by reason of the premises it was impracticable for them to make said proof on the hearing of this cause."

The court overruled the motion for new trial, and appellants assign this action as error. There was no error as assigned. They should have asked for a continuance or a postponement of the trial which was in progress, as soon as they learned that the books could not be produced. Instead of this, they proceeded with the trial without objection, taking the chances on a verdict on testimony, letters of Thomas disclaiming rights of property in the store, and after verdict, undertook to have it set aside and a new trial granted. The court had the power, discretionary, to grant a continuance during progress of the trial. Failing to avail themselves of this privilege, they can not after verdict claim the right to a new trial. The evidence was sufficient to support the verdict upon the ground that the goods taken were the property of deceased and assets of the estate, to the possession of which the administrator was entitled for purposes of administration.

2. Defendants had no title to the goods or right of possession, and were wrongdoers in taking them without the consent of Thomas, who was in possession of them. It is the law that possession of personal property will support an action for its recovery against a wrongdoer. Grooms v. Rust, 27 Texas, 234. If the goods can not be found, then an action will lie in favor of the person entitled to the possession for their conversion. Williams, as administrator, was entitled to the goods or their value, and it was his duty to creditors and the estate to recover them.

There was no error, and the judgment of the lower court is affirmed.

*Affirmed.*

### OPINION ON REHEARING.

COLLARD, ASSOCIATE JUSTICE.—The motion for rehearing must be overruled. Our former decision, that the administrator was entitled to the possession of the goods for the purposes of administration, must stand.

Appellant made an effort to show that Thomas was not the owner of the goods, but we decided that appellants were wrongdoers and could not take the goods from one rightfully in possession, as was Thomas during his life, and hence the administrator's duty was to take the goods to be administered in due course of law.

The motion in the court below for a new trial on the ground that the books of the store kept by Thomas would show that they were kept in the name of N. E. Lewis and J. L. Goree, was properly overruled.

The books would only tend to show the fact stated, and would be cumulative evidence, assisting the letters of Thomas read in evidence on the trial,—strictly cumulative evidence, in the nature of admissions that the goods belonged to other parties; that is additional testimony of the same kind and to the same point. It has often been decided that newly discovered evidence, when merely cumulative, will not authorize the granting of a new trial. State v. Moore, 7 Texas, 258; Oil Company v. Thompson, 76 Texas, 238; Railway v. Wood, 69 Texas, 682; Connill v. Railway, 85 Texas, 102; Walker v. Brown, 66 Texas, 558. As to what is cumulative evidence, see Railway v. Forsyth, 49 Texas, 180.

The motion for rehearing is overruled.

*Overruled.*